## RIO BRAVO OIL CO. v. DANIEL.
### (No. 1732.)

Court of Civil Appeals of Texas. Beaumont.
Aug. 7, 1929.

F. J. & C. T. Duff and Lamar Cecil, all of Beaumont, for appellant.

Tom C. Stephenson and C. A. Lord, both of Beaumont, for appellee.

HIGHTOWER, C. J. This suit was filed by the appellee, A. H. Daniel, against appellant, Rio Bravo Oil Company, a private corporation, to recover damages for personal injuries alleged by appellee to have been sustained by him in consequence of negligence on the part of appellant on October 30, 1927. Appellee alleged in substance that appellant was engaged in the production and storing of crude petroleum oil at what is known as Spindletop oil field in Jefferson county, and that on October 30, 1927, appellee was an employee of appellant as a common laborer, and that his duties were to do whatever he was directed to do by appellant or by its foreman; that on said date appellee and other fellow employees were directed by appellant's foreman to clean out an oil tank owned

by appellant on its lease at Spindletop oil field which had been used for the storage of crude petroleum oil; that the tank which he was so directed to clean out contained large quantities of poisonous and deadly gases, which fact was known to appellant and its foreman at that time, or by the use of ordinary care could have been known, but that appellee did not know of the presence in the tank of such poisonous and deadly gases; and that he was not warned or notified in any manner by appellant of the presence of the gases in the tank nor of the danger that would be attendant upon the attempt to clean the tank, and that if he had been so notified or warned by appellant he would not have undertaken to clean the tank as he did. Appellee then further alleged that, complying with the direction and order of appellant's foreman to go inside of the tank and proceed to clean it, he ascended the tank and went upon top of the same and went down from the top through a manhole and on a ladder to the bottom of the tank, and that after being in the tank a few minutes in the discharge of his duties of cleaning it out, he was overcome and prostrated by the inhalation of the poisonous and deadly gases that were in the tank, in consequence of which he was made very sick and became unconscious, and was thereafter confined for a great length of time in a hospital on account of the injuries sustained by him, which injuries resulted in permanent impairment and destruction of appellee's ability to work and earn money, and that he had sustained damages to the extent of $35,000. The injuries alleged to have been sustained were specified as injuries to his lungs, kidneys, head, nervous system, heart, and all the tissues of his body.

The grounds of negligence relied upon for recovery were specified as follows: (1) That appellant was guilty of negligence in failing to furnish appellee with a reasonably safe place in which to perform the services required of him; (2) that appellant was guilty of negligence in failing to expel the poisonous and deadly gases from the tank and thereby make it reasonably safe for appellee to enter therein for the purpose of cleaning it out; (3) that appellant was guilty of negligence in ordering and directing appellant to enter the tank under the circumstances and conditions at the time he was so ordered to enter the tank; (4) that appellant was guilty of negligence in failing to warn appellee of the presence of the poisonous and deadly gases in the tank and the dangers incident to his attempt to clean the same; (5) by trial amendment appellee alleged in substance that appellant was guilty of negligence in failing to warn and instruct him not to go inside of the tank to clean it out. It was alleged further by appellee that each act of negligence specified was a proximate cause of his injuries.

Appellant's answer consisted of a general demurrer and general denial.

The case was tried with a jury and was submitted upon special issues, all of which were answered in favor of appellee, and upon the verdict as returned judgment was rendered in his favor for $7,500 with interest at the rate of 6 per cent. per annum from the date of the judgment; and its motion for new trial having been overruled, appellant has duly prosecuted this appeal.

A number of errors have been assigned challenging the correctness of the verdict and judgment against appellant relating to the form of the issues submitted to the jury, the refusal of the court to submit a special issue requested by appellant, errors in the instruction of the court as to legal terms, and the insufficiency of the evidence to support the jury's verdict.

In answer to the special issues submitted, the jury found, in effect: (1) That appellant directed appellee to go inside of the tank to clean it; (2) that appellant was guilty of negligence in directing appellee to go into the tank to clean it; (3) that appellant was guilty of negligence in failing to direct appellee not to go into the tank to clean it; (4) that appellant was guilty of negligence in failing to warn appellee of the danger of going into the tank to clean it; (5) that appellant was guilty of negligence in failing to expel the gas from the tank before appellee entered the same to clean it. The jury also found that each of the acts of negligence established by their finding was a proximate cause of appellee's injuries, and further found that he had been damaged to the extent of $7,500.

The first two propositions advanced by appellant relate to the refusal of the trial judge to submit for the jury's consideration the following special issues:

(1) "Was the plaintiff, A. H. Daniels, in going into the tank under the conditions and circumstances under which he went into said tank on the occasion in question guilty of negligence as that term has been defined to you?"

(2) "If you have answered the foregoing question 'yes,' then answer this question: Was said negligence on the part of the plaintiff, A. H. Daniel, the sole and proximate cause of the injury to plaintiff, if any? Answer Yes or No."

Appellant, in connection with its contention that these requested issues should have been submitted, makes the following propositions:

"First Proposition. It being a settled and undisputed rule of law that where a claimant's negligence is the sole and proximate cause of his alleged injury or injuries, he cannot recover, the trial court erred in refusing to give Appellant's Special Issue No. 1, which in effect submitted the issue of the defendant's negligence being the sole and prox-

imate cause of his injury, the evidence being abundant to show negligence on Daniel's part in entering the said tank, which negligence was the sole and proximate cause of the alleged injury, if any.

"Second Proposition. The fact that the trial court submitted the question of the defendant's negligence to the jury in Special Issues Nos. 1 to 9 inclusive, and the jury answered these Special Issues in the affirmative, does, not cure the error of the trial court in refusing to submit defendant's Special Issue No. 1 as to plaintiff's negligence being the sole cause of his injury, because this defendant was entitled to an affirmative presentation of all its defenses."

Let it be conceded, as we think it should be, that appellant's first proposition in this connection states a correct abstract proposition of law, and therefore we will not further notice this proposition.

We also agree with appellant as to the soundness of its second proposition in this connection as a correct proposition in the abstract, but we cannot sustain it for the reason that in our opinion there is no basis in appellant's pleading to support it. We have already shown that appellant's answer in this case interposed only a general denial. The rule that counsel for appellant are here seeking to have applied is that a party litigant in a case submitted to a jury upon special issues is entitled to have submitted for an affirmative finding by the jury each and every material issue raised by his pleading and supported by proof. This rule is well established by the decisions of our Supreme Court as well as by the decisions of all of the Courts of Civil Appeals of this state, and this court has applied it a number of times. In Anderson Bros. v. Parker Construction Co., 254 S. W. 642, 645, this court, after citing and discussing at some length the authorities of this state applying this rule, held: "We therefore again announce the rule to be that either party to a litigation in the trial court, whether submitted to a jury under a general charge or upon special issues under the statute, is entitled, where he properly requests it, to have any group of facts properly pleaded and sustained by evidence submitted to the jury for consideration and determination, where a finding by the jury upon the facts so grouped would be determinative of the ultimate issue to which such facts relate and would control the judgment to be entered as to that issue."

In Oilbelt Motor Co. v. Hinton, 11 S.W.(2d) 338, 339, the Eastland Court of Civil Appeals, in applying the rule here contended for by appellant, said: "In submitting a case upon special issues, both parties are entitled to have their theories of the case and the facts constituting the cause of action on the one hand and matters pleaded in defense on the other, affirmatively submitted for the determination of the jury"—citing Fox v. Dallas

Hotel Co., 111 Tex. 461, 240 S. W. 517; Colorado, etc., Co. v. Rowe (Tex. Com. App.) 238 S. W. 908; Wichita Valley Railway Co. v. Williams (Tex. Civ. App.) 6 S.W.(2d) 439; Robinson v. Ætna Life Ins. Co. (Tex. Com. App.) 276 S. W. 900; Northern Texas Traction Co. v. Woodall (Tex. Com. App.) 299 S. W. 220.

Upon careful examination of all the authorities cited by the court in the Hinton Case, it will be seen that they hold that a party litigant is only entitled to have submitted for the jury's affirmative finding in special issue cases such issues as are tendered affirmatively by his pleading. In none of the authorities that we have read where this question was discussed did any of them hold that a defendant was entitled to have submitted for the jury's consideration and affirmative finding any material issue not tendered by his pleading.

In Brewton v. Butler (Tex. Civ. App.) 12 S.W.(2d) 228, 229, the court, in discussing the rule we are now considering, said: "While no question seems to have been made of this omission to thus submit the defendant's theory, yet in view of another trial we desire to call attention to the line of authorities which hold that, in submitting a case upon special issues, both the litigants are entitled to have their theories of the case and the facts constituting the cause of action on the one hand, and the matters pleaded in defense (and supported by testimony) on the other hand, affirmatively submitted for the determination of the jury." A number of authorities were there cited by the court, all of which support the holding.

In Scott v. Waldrop (Tex. Civ. App.) 8 S. W.(2d) 552, 553, where the court was discussing a case submitted upon special issues, it was said: "A court is not required to submit to the jury an issue of fact having no support in the evidence. To authorize the submission of an issue of fact to a jury, such issue must be raised by both the pleadings and the evidence." The court there had in mind article 2189, Rev. St. 1925.

In Morton Salt Co. v. Lybrand (Tex. Civ. App.) 292 S. W. 264, 265, where the question of the right of a defendant to have submitted an issue for an affirmative finding by the jury was under discussion, the court said: "The statute [article 2189] in regard to the submission of special issues authorizes a submission only when 'raised by the pleadings and the evidence,' in other words, to justify its submission, the issue must be raised by both the pleadings and evidence; if raised by the pleadings and not by the evidence, or, vice versa, it should not be submitted."

In the case of Horton & Horton v. House, 13 S.W.(2d) 966, recently before this court, the appellant presented as reversible error the refusal of the trial court in that case to submit to the jury a requested special issue calling for an answer as to whether the driver

of the automobile in which the plaintiff in that case was riding was guilty of negligence which was the sole proximate cause of the plaintiff's injuries. We held, in disposing of that contention, that the refusal of the trial court in that case to submit the requested issue was not error because there was no pleading by the defendant in that case that the negligence of the driver of the automobile was the sole proximate cause of the plaintiff's injuries, and that therefore, under the rule that we are now discussing, the defendant in that case was not entitled to the submission of the requested issue for an affirmative finding by the jury. The evidence in that case was sufficient as a basis for the requested special issue, but as there was no pleading by the defendant as a basis for it a majority of this court held that there was no error in refusing the issue. Mr. Justice Walker, on that point, dissented from the conclusion reached and the case is now pending before the Supreme Court on writ of error. The notation made by the Supreme Court in granting the writ would indicate that the majority of this court was in error on the point, but notwithstanding that fact a majority of this court is still firmly of the opinion that we were right on the point and in full accord with all the authorities of this state where the question was up for decision.

Learned counsel for appellant, among other authorities cited by them in support of their contention in this connection, cite Missouri, K. & T. Railway Co. v. McGlamory, 89 Tex. 635, 35 S. W. 1058. In that case the defendant railway company had specially pleaded as a defense to the plaintiff's suit that the plaintiff at the time he was injured was so intoxicated from the use of liquor that he was deprived of the ability to use that degree of care required of him, and for that reason he was guilty of contributory negligence which was a bar to his recovery. In connection with this specially pleaded defense, the defendant requested the trial court to group in its charge to the jury the specific facts that it had pleaded as constituting contributory negligence on the part of the plaintiff, and to tell the jury in the charge that if they found this group of facts to be true they would return a verdict for the defendant. The trial court refused to so instruct the jury, and upon appeal this was held to be error. Judge Denman, who was then on the Supreme Court, was careful to say in the opinion that this group of facts which the court was requested to submit to the jury had been specially pleaded by the defendant, and that if true the plaintiff was not entitled to recover, and that the defendant was entitled to have submitted to the jury this affirmative defense raised by its pleading and followed up by evidence.

Now what "group of facts" has appellant in this case tendered by its answer which, if found to be true, would constitute a defense to this action? This, as we understand all the authorities, is the test of the right of a defendant to have submitted for a jury's consideration and determination any issue upon which he relies as a defense and which, if found to be true, would control the judgment in his favor. It is true that under the general denial a defendant may, by evidence, refute and rebut any fact or facts pleaded by the plaintiff as constituting his cause of action, and his evidence under the general denial may be argued by his counsel to the jury in the hope of securing a finding by the jury against the plaintiff on the issues of fact tendered by his petition. But this is quite a different question, we think, from the right of a defendant in a trial where the cause is submitted upon special issues to have submitted for an affirmative finding and determination by the jury any fact or group of facts pleaded by him as a defense to the action and which, if found to be true, would control the judgment in his favor. In the instant case it is not only not pleaded by appellant that some act or omission on the part of appellee alleged to be negligence was the sole proximate cause of appellee's injuries, but it is not even pleaded that appellee was guilty of any negligence. Therefore there was no "group of facts" contained in appellant's answer that presented any defense to appellee's alleged cause of action, "and which, if found to be true by the jury, would have constituted a defense to the plaintiff's cause of action." These conclusions dispose of appellant's first and second propositions and they are overruled.

The trial judge in this case in his charge to the jury defined the term "proximate cause" as follows: "By 'proximate cause,' as that term if used herein, is meant that cause which in its natural continuous sequence unbroken by any new independent cause produces an event or injury, and but for which the same would not have occurred." In due time counsel for appellant tendered to the trial court the following objection to the definition of proximate cause: "The defendant objects to the court's definition of proximate cause because same is an incorrect definition of said term, is confusing and misleading and does not properly advise the jury as to what is meant by said term, and defendant specially excepts to said definition because it does not correctly inform the jury as to what is meant by natural continuous sequence unbroken by any new independent cause." This objection was overruled by the trial court, and that action made the basis of an assignment here.

Under a comparatively recent holding by our Commission of Appeals, the trial court's definition of the term "proximate cause" was incorrect, and its action in overruling appellant's objection was erroneous because the

words "natural continuous sequence unbroken by any new independent cause" now have a well-defined meaning as a legal term which is not understood by laymen. Robertson & Mueller v. Holden (Tex. Com. App.) 1 S.W. (2d) 570; Thomas v. Goulette (Tex. Civ. App.) 12 S.W.(2d) 829; Linn Bros. Motor Co. v. Williams (Tex. Civ. App.) 293 S. W. 658. It will also be observed from the court's definition of "proximate cause" that the element of foreseeableness is lacking; but this, as we construe the objection interposed by counsel for appellant, was not presented for the trial court's consideration, and for that reason appellant cannot now urge that defect in the trial court's definition which its counsel seek to do. Though counsel for appellant did not tender to the trial court a proper definition of the term "proximate cause" and request its submission, they were permitted to save the point by their objection to the definition as far as it went. Gulf, C. & S. F. R. Co. v. Conley, 113 Tex. 472, 260 S. W. 561, 32 A. L. R. 1183; Panhandle & S. F. R. Co. v. Parrish (Tex. Civ. App.) 281 S. W. 887.

█ Counsel for appellant, by the third proposition presented in their brief, contend that the jury's finding to the effect that appellant directed appellee to go inside of the tank to clean it was wholly without support in the evidence adduced upon that point. We have given this contention careful consideration and have reached the conclusion that this contention is sound and must be sustained. As we view the evidence as a whole in this connection, there is nothing that authorizes the jury's finding that appellee was directed by appellant or by any one authorized by appellant to go inside of the tank in order to clean it. The only evidence that tends in the slightest degree to support this finding is the testimony of appellee to the effect that he thought that they meant for him to go into the tank in order to clean it, because on the evening before he and other fellow employees had cleaned out another one of appellant's storage tanks by going on the inside of it and attempting to do his work as he did on the morning that he was injured. This, however, could not work a reversal of this judgment, because other findings of the jury, as we have shown above, convicting appellant of negligence would be sufficient to sustain this judgment in so far as the question of appellant's liability is concerned.

Appellant by its fourth, fifth, and sixth propositions challenges the sufficiency of the evidence to sustain the amount of damages found by the jury in favor of the appellee. As we have already shown, the amount awarded him by the jury was $7,500. We shall, at this point, proceed to state substantially all of the material testimony found in this voluminous record bearing upon this contention, and will first state so much of the evidence as is wholly without dispute.

On the morning of October 30, 1927, about 7:30 o'clock, appellee and three other fellow employees were directed by appellant's foreman to clean out one of appellant's storage tanks used for storing crude petroleum oil produced by appellant at the Spindletop oil field in Jefferson county. The tank was made of steel and had the capacity to hold a thousand barrels of oil. It was 16 feet in diameter and 18 feet high. Oil which had been stored in the tank had been drawn off, leaving a heavy sediment at the bottom of the tank called by oil men "BS." This sediment, according to the evidence, was about 6 inches deep. Appellee and one of his fellow employees, A. L. Pliac, got up on top of the tank, which was covered by a steel covering, for the purpose of going through the top and going down on a steel ladder from the top to the bottom of the tank. There was an opening at the top of the tank called a manhole, and when appellee reached the top of the tank he at once entered the tank through the manhole and went down the steel ladder to the bottom of the tank, and after he had been there somewhere between 5 and 10 minutes scraping and shoveling the "BS" from the bottom of the tank out through another hole in the side of the tank at the bottom, he was overcome by gas fumes and proceeded back up the steel ladder, down which he had come, to the top of the tank and called for assistance, and he was at once removed from the tank in an unconscious condition and carried immediately to the city of Beaumont and there placed in a hospital. This happened about 8 o'clock in the morning, as best we are able to gather from the evidence. Appellee remained unconscious until somewhere about noon of the same day. He testified in this case that when he regained consciousness in the hospital, he had a very severe headache and was very nervous, and that shortly thereafter he felt pain in his chest and lungs. He testified that his headache continued to grow worse, and that the pain in his chest and lungs grew more severe, and that after he had been in the hospital about three days kidney trouble set up, and that he had to urinate about every 15 minutes, and that this condition continued practically all the time that he was confined in the hospital. He also testified that after about the third day in the hospital he began to cough and have discharges from his lungs, which kept paining him, and that this continued during the time that he was in the hospital, and that he remained in the hospital about three weeks in this condition, and then went to a private boarding house in the city of Beaumont, where he remained and was confined most of the time until he left Beaumont for Marion, Okl. He testified that during all the time that he was at the private boarding house in Beaumont he continued to suffer pain in his head and chest and lungs and that his kidney

trouble continued and that he was unable to do anything and was practically a physical wreck. He testified at the trial of this cause, which occurred in March, 1928, that there had been no improvement in his condition since the time he was injured, and that he still continued to suffer from headache, pains in his lungs and chest, and that he was still very nervous and unable to sleep as he should, and that he still continued to cough and to have discharges from his lungs. He testified that he had been unable, on account of his condition, to do any kind of work whatever and that he had lost 20 pounds in weight between the time he was injured and the date of the trial. He testified that he was 34 years of age at the time he was injured and that up to the time of his injury he had always been a well man and able to do hard manual labor of any kind and had always performed such labor.

Dr. A. A. Bailey, a witness for appellee, testified substantially that he was called to examine appellee in the hospital at Beaumont about 15 or 20 days after appellee was injured; that he was requested to make the examination by one of appellee's attorneys. Dr. Bailey testified that when he called to see appellee he was complaining of severe pain in his head and chest and of trouble with his kidneys, and that appellee was coughing and having discharges from his lungs, and that he could hear rales in appellee's lungs. He testified that appellee at that time was very nervous and that his tendon reflexes were much exaggerated. Dr. Bailey testified that he attributed this condition of appellee to the effects of the gas inhaled by him while cleaning out the tank on October 30, 1927.

After appellee had left the hospital and was staying at the private boarding house in Beaumont, Dr. Bailey went there to see him two or three times, and the doctor testified that each time he went he found appellee in practically the same condition that he was in when he first saw him in the hospital, with the exception that his respiration, pulse, and heart action were more nearly normal. The doctor stated that when he first examined appellee in the hospital he found his respiration and pulse and heart action to be very abnormal, and stated that his heart beat was about 96 a minute while the normal heart beat was about 72 a minute.

The evidence showed that on January 20, 1928, Dr. Bailey was again summoned to the private boarding house to see appellee, and the doctor testified that on that visit he found appellee in a very serious condition, and that he again visited him at the private boarding house that same night and found him in what he believed to be a dying condition; that he was very weak and nervous, and after examining him the doctor phoned to one of the attorneys of appellee that he thought that appellee was dying. The evidence showed that about 12 o'clock that same night appellee was

removed from the private boarding house and carried back to the hospital in Beaumont, where he remained three days and then immediately left with his family for Marion, Okl.

Dr. Bailey testified that the last examination he made of appellee was on the morning of the trial of this case, and that upon that examination he found appellee to be still in a very nervous condition and that his heart action was still abnormal, and that he could hear, by putting his ear to appellee's breast, rales in appellee's lungs, and that appellee still complained of pains in his chest and lungs. The doctor testified that he had lived in the city of Beaumont a good many years before appellee was injured, and that he had had quite a number of patients who had been "gassed" in the Spindletop oil field in the early days, and that he thought he understood the effects produced upon the human system by the inhalation of gas in that field. He further testified that he had read a great many medical authorities on the effect of gas on the human system, and that from his experience in the treatment of patients who had been affected by gas and from his reading on medical authorities upon the effects of gas it was his opinion that appellee's condition as described by him, from the time he first examined him up to the day of the trial, was caused by the gas that was inhaled by him while cleaning out appellant's tank. Dr. Bailey's testimony in this case is very lengthy, covering nearly 32 pages of the statement of facts, and it would be out of all reason to undertake to follow him in detail in our statement of his testimony. After being interrogated at great length by counsel for both sides, Dr. Bailey finally concluded and stated positively several times that appellee's condition, as he had described it, was the after effects of carbon monoxide gas.

At this point, in order to show clearly the opinion of Dr. Bailey as to the cause of appellee's condition, we quote from his testimony the following: "I consider that this man is suffering from a gas poisoning that has carbon monoxide in it. No, I don't think that he is suffering from carbon monoxide gas poisoning, he is suffering from the effects of carbon monoxide in the blood; carbon monoxide, so far as we know, is not exactly a poison from the standpoint of poisoning; it deprives the blood of its oxygen and, therefore, it destroys the hemoglobin. The injury done to a man is the carbon—I assume it is carbon monoxide—a man may linger for a day or so and the carbon monoxide will disappear, the oxygen is reestablished and there is no further evidence of the carbon monoxide but the damage done during its presence in the blood is almost an irreparable damage. Yes sir, that is what I think this man is suffering with: he is suffering from the effects of the carbon monoxide poisoning. * * * I did not say on direct examination that this

man was suffering from carbon dioxide gas poisoning: I said that he was suffering from the effects of carbon monoxide gas poisoning, not carbon dioxide. * * * I said that the trouble with this man now is that he is suffering from the effects of the carbon monoxide gas poisoning due to the fact that he inhaled this carbon monoxide gas into his lungs."

Again we quote from Dr. Bailey: "Yes sir, I think this man is suffering from carbon monoxide poisoning and not from hydrosulphate; that is what I believe in this case. I don't think hydrosulphate gas has anything to do with this man's condition in this case. If there is no carbon monoxide gas produced by this oil out there at Spindletop, then I admit that my diagnosis is all wrong."

Again we quote from Dr. Bailey's testimony: "When we stopped for lunch we was speaking of this carbon monoxide gas; I stated that in my opinion this man was suffering from the effects of carbon monoxide gas poisoning; I also stated that if he wasn't suffering from the after effects of this carbon monoxide poisoning then my diagnosis was all incorrect. I will say that this is my opinion, that he is suffering from carbon monoxide gas poisoning, that is, the effects of it, and if he is not suffering from that then my diagnosis is all wrong. I will also state that if it is a fact that this Spindletop petroleum oil does not produce carbon monoxide gas, but contains a hydrosulphate gas, that my diagnosis and opinion is all wrong."

And further we quote from Dr. Bailey's testimony: "I will say that there is no other gas that I ever read about that produces those effects on the human being."

Again: "I stated that carbon monoxide gas came from petroleum oil in its natural state, but I haven't my authority for it. I thought I had a case on that very point but I don't know where it is. I thought I had it but I didn't."

Again we quote from Dr. Bailey: "I can't produce any book or authority which says that carbon monoxide is produced from petroleum oil in its natural state. I don't know whether I have any authority which says that carbon monoxide gas can be produced and thrown off from petroleum oil in its natural state without subjecting it to severe heat or incomplete combustion; I don't know whether I could find any such authority as that or not: There is so much on the subject that it is very difficult to distinguish the particular poisons, but the gas is carbon monoxide gas, according to my understanding. It is my understanding that the gas that comes from petroleum oil is carbon monoxide gas. I am just basing that on my general understanding: I haven't any authority to produce for such statement. I have produced all the authorities that I have on the subject."

Dr. H. A. Barr of Beaumont testified that he had been a practicing physician and surgeon in the city of Beaumont for a period of 27 years, and that during that time he had treated a number of patients who had been gassed at the Spindletop oil field. He stated that from his actual experience in treating such patients he found that when a person was gassed at the Spindletop oil field he usually recovered in a short while, and that there was never any after effects of gas upon any of the patients that he had treated so far as he knew or ever heard. He stated that he was called to see appellee within a short time after he reached the hospital on the morning that he was gassed, and that at that time he was partially delirious and remained so for three or four hours before he completely recovered from the immediate effect of the gas. He stated that appellee remained in the hospital for probably three weeks, or until about the latter part of November, and that during all the time appellee was in the hospital he saw him every morning. He stated that he made frequent examinations of appellee during the time he was in the hospital; that he examined his heart, pulse, lungs, tendon reflexes; and that he discharged appellee from the hospital after he had been there about three weeks for the reason that in his opinion appellee had completely recovered from the effects of the gas that he had inhaled. He stated that while appellee was in the hospital and somewhere about November 23d or 24th, he had three other doctors, Drs. Harlan, Mills, and Pate, to examine appellee, and that none of these doctors were able to detect anything wrong with appellee's heart, lungs, or kidneys, but that on the contrary his examinations from time to time and the examination by these three others doctors showed appellee to be in practically normal condition. He stated further, however, that appellee continued to complain during all the time that he was in the hospital, but he found nothing upon his frequent examinations of appellee to warrant such complaints.

In this connection we quote from Dr. Barr: "Oh, yes sir, the man recovered from the immediate effects of the gas. After that I made an examination of him to see if he was suffering from any other effects of that gas. I examined him, and as far as I could make out he had completely recovered: after a few hours he was all right. I examined his lungs and listened to his breathing: I also examined his heart; if there was anything wrong with his heart or lungs I never made it out. If this man's lungs had been in such condition that I could put my ear over his chest and hear mucous rales, I would have detected that in my examination of him. Sometimes they have these chest rales when they get gassed but, after a week or ten days they don't have any such condition as that. This man did not have any such thing as that a week or ten days or a month after he was gassed. If there was anything wrong with this man's heart and heart action I could

not make it out. If he had had an abnormal heart action and his pulse were abnormal I would have detected that in my examination of him. Right after he was gassed his heart beat might have been ninety-six: A week or ten days after he was gassed I don't know whether his heart beat was still ninety-six or not; the chart will show his pulse, respiration and temperature. I could not find anything wrong with this man at that time that I could attribute the gas to: As much as a week after this man was gassed I could not find anything wrong with this man that I could attribute the gas to."

Again: "From my personal examination of this man, say two or three days after he was injured on up to the time he left the hospital, I did not detect anything wrong with his heart or heart action. I would say, as far as my experience, information and knowledge goes, that there was nothing wrong with his heart or his heart action. I did not detect any brain lesions or any hemorrhages of the brain."

Again: "I have had experience in the past with the treatment of patients working out at Spindletop who had been gassed. If a patient gets some of that gas out there at Spindletop and it doesn't kill him while in the course of recovery, he will recover in a few days. I have never known of any after effects from this gas poisoning, such as is produced out there at Spindletop by that Spindletop oil. I have never followed any of those cases up after I discharged them but if they had any after effects they never reported it to me: I never observed it."

Again: "Before I discharged him from the hospital I examined him to see if he was all right: I had him examined to be sure that he was all right. He was examined when he first went to the hospital and he was examined all during the time that he was there and he was examined before he left the hospital. We made examinations from time to time, and basing the conclusion on those examinations that we made during the time he was in the hospital, we concluded that he had recovered."

Dr. H. D. Harlan, a physician of 18 years' experience, testified that he made a specialty of kidney, bladder, and venereal diseases. He stated that he was requested by Dr. Barr to examine and treat the appellee. He could not say just how long it was after appellee went to the hospital that he visited him, but thinks that it was somewhere between a week and two weeks. He stated that he examined appellee's kidneys, bladder, and urethra; that he examined his urine and passed a sound in him. The result of his examination was that he found a stricture of the urethra. He further stated that he found nothing wrong with appellee's kidneys. He said: "From my examination I found that he was not suffering from any kidney trouble: I didn't find him suffering from any kidney

trouble. He was suffering from a bladder disease." It was this doctor's opinion that the bladder trouble was due to the stricture. Quoting him further: "The breathing or inhaling of any kind of gas would not produce the condition that I found this man in." And further: "As a physician I will state that I did not find anything in this man's condition that I would attribute to gas poisoning, or the after effects of gas." This doctor stated that the Rio Bravo Oil Company paid him for his services in treating the appellee.

Dr. E. D. Mills of Beaumont testified that he had been requested to examine appellee as to his lungs only. He said: "I was called to make an examination of Mr. Daniel, the gentleman sitting here: I was called to examine his lungs. I did not examine any other part of his body. I just examined his lungs to try and locate any trouble that he may have had in the lungs. I gave him a stethoscope examination. I examined him in my office. Let me see, I believe that I made that examination on or about November 30, 1927. As the result of my examination I found his lungs to be normal. When I examined his lungs I did not hear any mucous rales in his lungs. My examination was such that if they had been there I would have heard them. I examined him front and back. I had him stripped to the waist at the time I made my examination. I don't remember that I ever examined him at any other time or place: I don't remember examining him any more." The doctor further stated that appellee was not a patient of his, but that he just came to his office for examination. He stated that he thought that appellee had been sent to him for examination by the Rio Bravo Oil Company.

Dr. C. A. Cobb of Beaumont testified that he had been a practicing physician and surgeon for about 25 years. He stated that he had had experience in the medical branch of the arm during the late World War and made it a point to familiarize himself with the effects of gas on the human system. He further stated that he had treated a great many patients who had been affected by gas. He stated that he had had a good deal of experience in treating persons who had been affected by petroleum gas. In that connection he stated: "I have never known of any after effects or permanent effects on a person who has been subjected to these fumes where the concentration or the length of the exposure, was not sufficient to produce death. Whenever a person is overcome with gas he is knocked out; he is either killed or gets all right within a short time after being removed to the open. In all my experience and knowledge I have never known of a case where a person was overcome by gas and was not killed but was resuscitated where there was any permanent effect on the lungs, heart, brains, kidneys and so forth. I have never known of any such case a that; I have never

known of any permanent effects. I am speaking with reference to petroleum gasses."

Dr. J. N. Gardner of Beaumont testified that he was called upon by Dr. Mann of Beaumont on the night of January 20, 1928, to go to appellee's private boarding house in the city for the purpose of ascertaining his condition and treating him. In this connection he stated: "When I got there there was some lawyer, I believe his name is Limpscom or Lindstrom, met me at the door, and directed me into the room where the patient was, and he asked me to examine this man. He or someone else in the room said that the man had been gassed; they said something about his kidneys bothering him. They said that he had been gassed in a tank while working for the Rio Bravo, something like that, and they said that he had been gassed and had been having trouble with his kidneys and Doctor Bailey had said that he didn't think he could live very much longer. I did not make a very extensive examination of the man. It was an awfully cold night and the room where he was—was very cold and so I didn't think it advisable to pull the cover off of him in the cold room, so I just listened to his heart and felt his pulse: I didn't make a very minute examination of him because it was too cold to expose him. It was too cold to turn the cover down on the man and I only made a superficial examination of him. * * * When I examined his heart that night it was apparently normal. I did not make any examination of his lungs: I didn't go over his lungs enough to tell anything about his lungs, because it was too cold there in the room and I didn't think it was advisible to expose him to the cold. Yes, sir, his heart was normal when I examined him. From my examination that night I did not see anything to be uneasy about in his condition. From my examination that night I couldn't find anything to be alarmed over. His pulse and everything seemed to be all right; they seemed to be normal, he seemed to be in a nervous condition, but otherwise he didn't seem to be in any immediate danger. The man was not unconscious when I visited him. He could recognize and talk to me; he talked to me enough to tell me what his symptoms were. The examination that I made of the man's heart and pulse revealed that they were normal. He appeared to be a little nervous, but other than that I could see nothing materially wrong with him. I have never seen or treated this man in a medical way since that time." According to the record this visit of Dr. Gardner to appellee was made a few minutes before appellee was removed or went back to the hospital.

Dr. J. A. Hart of Beaumont, who was associated with Dr. Pate of Beaumont, examined appellee at Dr. Pate's request and made an X-ray picture of his lungs. Dr. Hart, among other things, testified: "When I examined this man I gave him a general medical examination with the skiagraph. I haven't the skiagraph picture with me—it is in my office. In addition to the skiagraph examination we gave him the general medical examination. The general medical examination was negative, we couldn't find anything wrong with him. The general medical examination took in all the organs of the body, as well as all the parts of the body. It included his eyes, nose, ear, throat, heart, lungs, chest, pulse, temperature, respiration. We examined his lungs. The lungs showed normal; the lungs were normal as to respiratory sounds, no rales were heard over the lung area. In other words I made a complete general examination of this man. As the result of that examination I found nothing was abnormal. We found, from the results of that examination, that there was nothing the matter with him." This doctor further testified in substance that he made an X-ray picture of appellee's lungs and that this disclosed that appellee's lungs were normal. He did testify, however, that the X-ray picture disclosed an old scar tissue which could not, in his opinion, have been so recently produced as to be attributable to the gas inhaled by appellee in cleaning the tank.

A. L. Pliac testified in substance that he was the man that went into the tank with appellee on the morning that appellee was gassed, and that he followed appellee into the tank immediately after he had gone in and came out after appellee did. He testified that appellee was overcome with gas, as we have already shown, and that he was carried immediately from the tank, and further testified that he himself was affected by the gas; that is, that his eyes and nose were affected and irritated by the gas fumes. He further testified that for three or four days afterward he would become nauseated after eating and would sometimes vomit from the effects of the gas, but that within about eight or ten days he had completely recovered from the effects of the gas and had gone back to his work. This is about all of the material evidence of this witness that we find in the record.

For the purpose of refuting and rebutting the evidence of Dr. Bailey, who testified that appellee's condition was produced by the inhalation of carbon monoxide gas, appellant placed on the witness stand the head chemist from the Magnolia Petroleum Company, the Gulf Refining Company, the Pure Oil Company, the Texas Company, and the Sun Oil Company. We have gone through the entire evidence of all these chemists, as found in the statement of facts, and quote from them on this point as follows:

Mr. Leach, chemist for the Magnolia Petroleum Company, testified:

"In my experience I have never found any carbon monoxide gas produced in the new Spindletop field in the absence of any com-

bustion. In all my experience I have never heard of petroleum oil producing, or throwing off, carbon monoxide gas, in its natural state. * * * In my experience with the petroleum oil, and especially the new Spindletop oil, I have never known of carbon monoxide gas being given off by that oil in the absence of combustion. These oils do not give off carbon monoxide gas in their natural state. This new Spindletop petroleum oil does not give off carbon monoxide gas in its natural state. Take a tank that has been filled with this new Spindletop petroleum oil—the oil is drained off and there remains on the bottom of the tank a sediment commonly referred to as 'BS'—the exact quantity of the 'BS' is uncertain. Some of the men say it was less than knee deep while others say it was more than knee deep. As a chemist, I do not think that it would be possible to encounter carbon monoxide gas in that tank, there having been no combustion or fire, or explosion or anything of that kind in it; I do not think that it would be possible to encounter carbon monoxide gas under those conditions. I know the kind of gas is given off by this new Spindletop oil out there—it is hydrosulphate gas."

"The petroleum oil contains carbon monoxide gas, but it does not throw it off in its natural state—you have to apply heat or combustion to the oil to produce the carbon monoxide gas. * * * It is my theory that the fluid itself has to be burned up, consumed by fire, or some kind of combustion, before carbon monoxide gas results. That is the only way carbon monoxide gas could be produced, according to my theory. That is the only way, yes. It is impossible to get it any other way. That is the only way that you could get it. It is an impossibility to get carbon monoxide gas any other way. I will stick to that if I get your question right. Carbon monoxide gas is produced by combustion, that is, by burning the fluid. * * * "

Mr. M. L. Hill, chemist for the Gulf Refining Company, testified as follows:

"Carbon monoxide gas is not given off by any petroleum in its natural state.

"To produce carbon monoxide gas you have to have at least a temperature of 200 degrees or an incomplete combustion. In all my experience I have never known of petroleum oil in its natural state giving off carbon monoxide gas; it cannot be done. I have no actual facts or figures to base an opinion on, but I would say that a person could not live in a temperature of 200 degrees. We do not have a temperature of 200 degrees around here on the outside. The temperature never gets 200 degrees around here. If it did get 200 degrees around here I imagine that it would be rather warm around here. In my opinion 200 degrees would be rather warm."

"Where death is not produced, I have never in all my experience known of any case where there was a serious after effect or permanent injury or effect, to a human having been overcome by the petroleum gases. If a man is overcome by these gases given off by petroleum oil and death does not follow, in all my experience and observation I have never known of a person suffering any serious after effects—it either kills him or he is knocked out for the time being and as soon as he is gotten into fresh air and is revived he is all right."

Mr. B. A. Beathy, chemist for the Pure Oil Company, testified as follows: "I have never found carbon monoxide gas in petroleum oil in its natural state. In all my experience and from my knowledge as a chemist, I have never known of petroleum oil giving off carbon monoxide gas. It is my opinion that it would be impossible for petroleum oil to give off carbon monoxide gas where there is no fire and it is not subjected to a heat of 200 degrees or more."

Mr. O. E. Lawer, chemist for the Texas Company, testified: "In my analysis of petroleum oil I have found out what kinds and character of gases are given off by the petroleum oil in its natural state. I have never found carbon monoxide gas in petroleum oil in its natural state. I think it would be impossible to produce carbon monoxide, or for petroleum oil to give off carbon monoxide gas, where the oil was not burned or subjected to heat of at least 200 degrees."

Mr. A. S. Johnson, chemist for the Sun Oil Company, testified:

"As chemist for the Sun Oil Company, I have had occasion to make an analysis, test and examination of the oil produced at the Spindletop oil field. I make that examination, test and analysis of every well out there. I don't only make that analysis, test and examination of the wells produced by the Sun Oil Company, but every well that is brought in in the new Spindletop oil field. I have never, in any of the examinations of this oil produced in the new Spindletop oil field, found any carbon monoxide gas given off by the oil in its natural state. I say that I have never found where the petroleum oil in its natural state gave off carbon monoxide gas."

"I know the temperature of the Spindletop oil in the new field. The temperature of those wells vary anywheres from 70 degrees to 105 degrees. 105 degrees is the highest temperature that I have ever found of that oil at the new Spindletop oil field. It is impossible for carbon monoxide gas to be given off by petroleum oil at a temperature of 105 degrees."

"In my experience as a chemist and from my knowledge of this Spindletop oil, I would say that it would be impossible to find carbon monoxide gas in a tank which had been used to store oil produced at the new Spindletop

field, where the tank had not been subjected to any heat other than the weather condition."

We believe that the statement we have above made of the material evidence found in this record bearing upon the physical condition of the appellee and the cause thereof is a fair and full statement, and the question for determination in this connection is as to whether this evidence was sufficient to warrant the jury's finding in favor of appellee for the amount that was awarded him. If his physical condition was such as he and Dr. Bailey testified it was, and that condition was caused or produced by the inhalation of gas, as claimed by the appellee in this case, then we would not hesitate to say and hold that the jury was fully warranted in awarding to him the amount of damages they did. We have given this matter most careful consideration, hesitating, as we always do, to disturb a jury's finding on fact issues. At the same time, we realize that this court has the authority, and that it is also its duty, to review and set aside a jury's finding of fact when this court is thoroughly convinced that such finding of fact is so against the overwhelming weight of the evidence as to be clearly wrong. That conclusion we have reached in this case. If we accord to each of the medical men, the physicians, who have testified in this case equal credibility, as we think we should do in the state of the record, we are unable to escape the conclusion that appellee's physical condition, as testified to by himself and Dr. Bailey, cannot be anything like as serious as they claim. It occurs to us that it is unreasonable to believe that appellee could be in that serious physical condition described by him and Dr. Bailey, and that that condition could be so readily and clearly discovered by Dr. Bailey as his testimony would indicate and at the same time escape detection by all the other physicians who examined and treated him, as we have shown. According to Dr. Bailey's testimony, about the only change in appellee's condition for the better from the time Dr. Bailey first examined him until the day of trial was that his kidney trouble had much improved. According to Dr. Bailey, appellee's heart and lungs and general nervous system at the time of the trial of this case were still in the greatly impaired condition that he found them in when he first examined appellee in the hospital. Dr. Bailey stated that he could with his naked ear, on the day that the trial commenced, hear the rales in appellee's lungs that he had heard when he first examined him and that his heart beat was practically as rapid as it was at the first examination. In short, according to Dr. Bailey, appellee was practically a physical wreck at the time he last examined him. On the other hand, equally as competent and credible physicians, so far as this record discloses, testified in ef-

fect that appellee was practically a normal man within a month after his claimed injuries in so far as his condition might be attributable to the inhalation of gas. But if we should concede that appellee's physical condition was as serious as his and Dr. Bailey's evidence would indicate, still we are confronted with the difficulty and duty of determining the cause of that condition. Dr. Bailey is positive and emphatic in his opinion that appellee's condition, whatever that might be, is the after effects of carbon monoxide gas poisoning and that this poisoning got into appellee's blood by his inhalation of that character of gas. It was Dr. Bailey's opinion, as we have shown, that carbon monoxide gas can be produced and thrown off from crude petroleum oil in its natural state. He admitted, however, that while he thought he could find medical authority to sustain him in that opinion and thought he had done so, that in fact he was mistaken and that he was unable to produce any medical authority holding that carbon monoxide gas can be produced or thrown off from crude petroleum oil in its natural state. He admitted, as we have shown, that he had never known any person to be affected by carbon monoxide gas at the Spindletop oil field, and to that extent he agrees with all of the chemists who testified in this case. After long and repeated questioning on direct and cross examination, Dr. Bailey stated, and several times repeated, that if appellee's condition was not the result or after effects of carbon monoxide gas poisoning then he (Dr. Bailey) was wholly mistaken in his diagnosis of appellee's condition and that it was "all wrong." In other words, as we construe Dr. Bailey's testimony, he testified most positively that if appellee's condition, whatever it is, was not caused or produced by the inhalation of carbon monoxide gas, it was not caused or produced by the inhalation of any character of gas. We cannot escape the conclusion that this must be the fair construction of Dr. Bailey's evidence. If Dr. Bailey is correct in that conclusion, we are unable to escape the further conclusion that the verdict of the jury in this case must be held to be excessive. According to the testimony of all the other physicians in this case, based both upon actual experience and general information in their medical line, the inhalation of petroleum gas by a person either kills within a short time or there is a complete recovery from it within a short time. That is the undisputed record in this case. And Dr. Barr testified, as we have shown, that the appellee in this case had so completely recovered from the effects of the gas that he had inhaled that he was able to go back to his work within two weeks from the time he came to the hospital, and Dr. Barr's evidence on this point was fully corroborated by every other physician who examined appellee, as we have shown

above. If these physicians were testifying truthfully in this case, it is manifest that appellee's injuries from the inhalation of the gas while cleaning the tank were only temporary, and he could not have been awarded justly any amount approaching the award that was made him in this case. We have reached the conclusion, after much consideration, that the only theory upon which we can sustain the amount of the verdict in this case is that Dr. Bailey was correct in his diagnosis of appellee's condition as being the after effects of carbon monoxide gas poisoning. In view of the clear and positive testimony of the five expert chemists who testified in this case, and whose testimony we have quoted above, we are constrained to conclude and hold that Dr. Bailey was mistaken in his opinion that appellee's condition, whatever that might be, was caused by the inhalation of carbon monoxide gas. There is nothing in this record to indicate that either of these chemists could have the slightest motive for giving false testimony, and nothing to indicate that either of them had the slightest bias or prejudice for or against either party to this suit, and if what they stated was true there was no carbon monoxide gas in the tank that appellee was cleaning at the time he was injured.

To sum up briefly the situation as we see it, it is this: All of the medical testimony in this case, including that of Dr. Bailey, negatives any conclusion that the serious condition that appellee claims to be in could have been caused by the inhalation of any gas other than carbon monoxide gas; and all of the evidence, save that of Dr. Bailey alone, shows overwhelmingly that appellee's condition was not caused by the inhalation of carbon monoxide gas. Therefore, we are constrained to hold that the verdict of the jury as to the amount thereof cannot be sustained, and since in the state of the record in this case we are unable to say what sum of money ought to be awarded appellee as a reasonable recovery, we have concluded that we should reverse the judgment and remand the cause.

We have not overlooked appellant's assignment of error complaining of certain remarks made by one of the attorneys for appellee in his argument to the jury. We will only say at this time that the remark complained of, as shown by the bill in that connection, was uncalled for and improper; but this perhaps will not occur upon another trial. All other assignments made by appellant than those above discussed are overruled.

Judgment of the trial court is reversed, and the cause remanded for a new trial.

WALKER, J. My views on the issue of sole proximate cause were expressed in Horton & Horton v. House, to which I adhere. I concur in the judgment reached by my brethren.